887 F.2d 1078
 58 USLW 2211, 11 Employee Benefits Ca 1707
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Fred CROCKER, Jr., Plaintiff-Appellee,
v.
SOUTHERN BELL TELEPHONE and Telegraph Company, Inc.,
Defendant-Appellant,
and
Bill Manior, Defendant.
 No. 88-3088.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 5, 1989.
Decided: Sept. 11, 1989.
 
 Richard Earl Fay (John T. Allred, Penni P. Bradshaw, L. Elizabeth Henry, Petree, Stockton & Robinson, on brief), for appellant.
 Lisa Gruel Caddell (Wardlow, Knox, Knox & Freeman, on brief), for appellee.
 Before DONALD RUSSELL and PHILLIPS, Circuit Judges, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Southern Bell Telephone & Telegraph Company, Inc. (Southern Bell) appeals a final judgment entered in favor of the plaintiff, Fred Crocker, Jr., in this case arising under the Employee Retirement Income Security Act (ERISA or the Act), 29 U.S.C. Secs. 1001-1461. After a bench trial, the district court concluded that Southern Bell's denial of Crocker's claim for certain benefits under the company's ERISA-qualified "Voluntary Accelerated Management Attrition Program" (VAMAP) was "arbitrary, capricious and in bad faith." J.A. at 265. The court also found that Southern Bell violated certain procedural requirements of the Act by "failing to provide plaintiff with a summary plan description" and "failing to provide ... written reasons and a reasonable administrative review of the denial of his claim for benefits." Id. at 266; see 29 U.S.C. Secs. 1022 & 1133. The court awarded damages totalling some $22,575.00, plus interest, attorney's fees, costs and expenses.
 
 
 2
 We now vacate the judgment and remand the case for reconsideration in light of Firestone Tire & Rubber Co. v. Bruch, --- U.S. ----, 109 S.Ct. 948 (1989), and this opinion.
 
 
 3
 * For the sake of convenience, we set out first our understanding of the way it is intended that the benefits program here at issue is to be administered.
 
 
 4
 * Southern Bell's VAMAP program provides for the payment of certain lump-sum bonuses to surplus management-level employees who agree to retire early. Under the terms of the plan, which is but one of three programs constituting Southern Bell's "Management Transition and Assistance Plan" (MTAP), the company may offer early retirement incentive bonuses to selected employees if it determines that there is a surplus or force imbalance in such employees' "management universe" (i.e., the department or division, as defined by Southern Bell, in which the employees work).[1]
 
 
 5
 The plan provides that Southern Bell's Vice President for Personnel may determine, in his sole discretion, whether a surplus exists in a given management universe, hence whether the company should offer a limited number of incentive bonuses under the VAMAP program.
 
 
 6
 The decision to implement any Program [including VAMAP] under MTAP must be made by the Vice President [for] Personnel, and the declaration and administration of the Plan's Programs are subject to his/her discretion exercised in a manner consistent with the terms of the Plan. This includes determining for what periods of time each Program will be in effect, determining the extent to which each Program is applicable to management force imbalance conditions, approving implementation, and authorizing all separations and all payments under the Plan.
 
 
 7
 MTAP Sec. 6.01, J.A. at 190.[2] Identification of surpluses and the possible need for the extension of VAMAP bonus offers is the responsibility first of Southern Bell's officers, who may
 
 
 8
 recommend implementation of VAMAP to the Vice President [for] Personnel as a solution to a force imbalance condition. This recommendation shall include a definition of the [relevant management] universe, identification of the magnitude of the force imbalance, and an indication that the imbalance is not expected to be handled by normal attrition in less than six (6) months.
 
 
 9
 Id. Sec. 6.03, J.A. at 191-92. The Vice President for Personnel will then "review the recommendation ... and, if appropriate, ... approve [it] for use." Id. Sec. 6.03(B), J.A. at 192.
 
 
 10
 After the Vice President for Personnel identifies a surplus and approves the extension of a given number of VAMAP bonus offers, officers responsible for the affected management universe draw up lists of employees eligible for VAMAP separation benefits. Id. Sec. 6.03(C), J.A. at 192. These officers then offer VAMAP benefits to candidates "in descending order of Net Credited Service (i.e., most senior first). This phase ... continue[s] until the identified force imbalance has been eliminated or all [eligible] candidates have been canvassed." Id. Sec. 6.03(E), J.A. at 193 (emphasis in original).
 
 
 11
 The company extends approved VAMAP offers by conducting formal employee discussions with each candidate. Id. Sec. 7.01, J.A. at 196. During these meetings, management provides each candidate with detailed information about the early retirement incentive program, including a preliminary computation of the lump-sum VAMAP payment which the personnel department anticipates the employee will be eligible to receive. Id. The candidate also receives a "Form MTAP-4," which he or she normally must complete within one week. Id. The form includes a space for the employee to "indicate his/her decision ... regarding the MTAP offer." Id. Sec. 7.04(B), J.A. at 197. The employee checks one of two boxes, which indicate either that he or she "decline[s] the Voluntary Accelerated Management Attrition Program" or "accept[s] separation under [VAMAP]." See J.A. at 208 (sample Form MTAP-4). If the employee accepts the VAMAP offer, he or she must acknowledge that the decision is irrevocable. Id.
 
 B
 
 12
 There is no dispute about the facts underlying Southern Bell's denial of Crocker's claim for VAMAP benefits. The parties focus instead on the proper characterization of those facts. Crocker claims that the company offered him a VAMAP bonus for which he was qualified and which he ultimately accepted, but then withdrew the offer before he actually retired. In so doing, he alleges, the company acted arbitrarily, capriciously and in bad faith. Southern Bell for its part, while conceding some departures from the plan's stated procedures, contends that its ultimate denial of benefits was strictly in accordance with the plan, hence is not subject to judicial rejection.
 
 
 13
 At least in this case, Southern Bell unquestionably failed to follow its standard procedures, as outlined above, for the implementation of the VAMAP program. In February of 1985, the company's officers apparently determined that there was a substantial surplus of managers in its "Network" divisions. Rather than identifying force imbalances in specific management universes, however, Southern Bell's personnel officers decided (with the approval of the company's Board of Directors) to solicit preliminary expressions of various employees' interest in accepting a prospective VAMAP offer.
 
 
 14
 Crocker worked as a repair crew supervisor in Southern Bell's Charlotte division. In late February, he received a bulletin outlining the company's plans for remedying the surplus. This mailing informed all Network supervisors that
 
 
 15
 [a] special Voluntary Accelerated Management Attrition Program (VAMAP) offer will be made to a number of ... management employees. This offer is planned to be made during March and April, 1985, with anticipated separation on or before May 30, 1985 for those who accept.
 
 
 16
 It has been determined that the needs of the business are such that there should be a reduction in the present number of managers. To accomplish this, we need to determine how many and which managers would prefer to leave the business if this VAMAP offer is made to them. By determining who would be interested in VAMAP, we will be able to plan more effectively. For the plan to achieve the best match between individual preferences and Company needs, more employees will be asked to complete the attached "Employee Expression of Interest [in] VAMAP Plan" form than the Company expects will receive an offer. Therefore, an expression of interest in VAMAP by an individual employee does not commit:
 
 
 17
 --the Company to offer VAMAP to that employee, or
 
 
 18
 --the employee to accept VAMAP if offered.
 
 
 19
 Employees who do not indicate an interest on the Expression of Interest Form will not be entitled to receive a VAMAP offer during the offer period, should they later change their mind.
 
 
 20
 Once we have evaluated the response to the initial polling of interest, a decision will be made regarding the number and universe(s) of employees who will be offered separation with VAMAP....
 
 
 21
 A MTAP summary booklet is available which includes a schedule for computing the VAMAP payment.... This should aid managers in determining their preference. Separation with VAMAP has no impact whatsoever on pension eligibility or the amount of retirement benefits.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 Id. at 176 (emphasis in original). On March 7, 1985, Crocker completed and returned the "Expression of Interest" form described in the bulletin, indicating thereon that he "would be interested in separation under [VAMAP]." Id. at 181.
 
 
 25
 The Network division received a far greater number of expressions of interest in VAMAP separation than it had anticipated. In an apparent attempt to determine which employees would definitely accept a VAMAP bonus if offered, division Vice President C.C. Patton instructed personnel officers to provide all employees who initially expressed an interest in VAMAP separation with an MTAP-4 acceptance form. These employees were to be told that, if they signed the form, "their signature [was] binding on their part, but not on the Company's." Id. at 232. Based on the number of employees executing irrevocable MTAP-4 acceptances, Southern Bell would then determine how many VAMAP bonus offers to extend.
 
 
 26
 The problem with this procedure, of course, was that the VAMAP plan provided for the execution of MTAP-4 forms only after the company determined: (1) that a force imbalance existed in a given management universe; and (2) that an individual employee was eligible, based on his or her seniority and the number of positions to be eliminated, for the extension of a VAMAP offer.
 
 
 27
 Crocker received and executed an MTAP-4 acceptance on April 2, 1985. Id. at 183. He acknowledges that one of his supervisors, Bill Mainor, informed him on that date that "[t]he company still ha[d] the right to back out." Id. at 51. Crocker protested and later contacted personnel officers about the status of his VAMAP claim. He was apparently told that management would have to declare him surplus before he could receive the early retirement bonus. Id. at 52.
 
 
 28
 On April 15, 1985, Mainor met with John Dautridge, who was the Network division's Charlotte district manager. After discussing whether a surplus would in fact be declared, Mainor and Dautridge decided to forward Crocker's executed MTAP-4 to the personnel division for processing. That evening, Mainor telephoned Crocker and informed him that he would be receiving the VAMAP bonus. The next day, Crocker told his work crew that he would be retiring in the next week. They threw him a party and gave him a retirement gift.
 
 
 29
 On April 19, 1985, Mainor told Crocker that he had not been declared surplus and would not, after all, be eligible to participate in the VAMAP program. On April 22, Crocker met with Dautridge, who confirmed that Crocker would not be declared surplus. Dautridge asked Crocker to remain in his job, but Crocker refused, saying that he intended to retire and sue the company for the VAMAP funds. Crocker later met with the personnel department's general manager, George Harmon, who allegedly told Crocker that his VAMAP claim had been mishandled. Harmon purportedly advised Crocker to sue Mainor.
 
 
 30
 Crocker originally filed suit in state court, the Superior Court of Mecklenburg County, North Carolina. Southern Bell then sought and obtained removal of the case to United States district court. The case was tried to a jury, but at the close of the evidence, the district court excused the jurors, finding that the case arose solely under ERISA. As indicated, the court eventually found that Southern Bell's denial of Crocker's VAMAP claim was arbitrary, capricious and in bad faith, and that the company's "administration of VAMAP was in conflict with the 'plain language' of the plan document." J.A. at 265. The court was apparently persuaded by Crocker's implicit claim that, because it had offered VAMAP benefits, Southern Bell was estopped from denying his claim. Having found that the company waited to withdraw its offer until "Crocker's psychological and emotional bridges had all been burned," id. at 263, it likened the case to a familiar fictional instance of detrimental reliance.
 
 
 31
 A recurring scene from "Peanuts" has Lucy holding the football for Charlie Brown to kick. After Charlie Brown has made his run and is committed to the kick, Lucy yanks the ball away and Charlie Brown, propelled by his commitment to kick, has a bad fall.
 
 
 32
 Mr. Crocker probably knows how Charlie Brown feels. Id. at 265.
 
 
 33
 This appeal followed.
 
 II
 
 34
 The threshold problem here is that, following what was previously thought to be the settled rule, the district court reviewed Southern Bell's denial of Crocker's VAMAP claim under the arbitrary and capricious standard for judicial review of ERISA plan administrators' benefits determinations. See, e.g., Holland v. Burlington Industries, 772 F.2d 1140, 1148 (4th Cir.1985); Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1006 (4th Cir.1985). In Firestone Tire & Rubber Co. v. Bruch, --- U.S. ----, 109 S.Ct. 948 (1989), however, the Supreme Court effectively rejected the arbitrary and capricious standard and, invoking trust principles, held that "a denial of benefits ... is to be reviewed under a de novo standard[,] unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which latter case review is for abuse of the discretion conferred. Id., --- U.S. ----, 109 S.Ct. at 956. This of course altered fundamentally the approach reviewing courts must take when presented with challenges to plan fiduciaries' benefits determinations, see DeNobel v. Vitro Corp., --- F.2d ----, ---- - ----, No. 88-3104, slip op. at 7-12 (4th Cir. ______, 1989), and it is in light of the new principles governing judicial review laid down in Bruch that the present dispute must be resolved.
 
 
 35
 In appropriate circumstances, we might be disposed to undertake first instance review of a challenged benefits determination where, as here, a district court had decided the case under the pre-Bruch arbitrary and capricious standard of review. See id., slip op. at 12. On the record before us in this case, however, there remain a sufficient number of unanswered questions that we consider it both prudent and in the interests of justice to remand for reconsideration of the original judgment in light of Bruch. Of course, on remand the district court may conduct any further proceedings it deems necessary against the backdrop of an already developed trial record. Solely on the basis of what is known about the circumstances surrounding the benefits denial here at issue we offer several observations about Bruch's implications for the reconsideration we think is required.
 
 
 36
 As Bruch made plain, the threshold question is whether the plan documents themselves vest in the administrators or fiduciaries discretionary authority to interpret disputed terms of the plan, or to decide disputed benefits eligibility questions. If the plan fiduciaries are indeed empowered to decide such questions, then de novo review is precluded, and the reviewing court may disturb the challenged benefits determination only upon a clear showing of abuse of discretion. Bruch, --- U.S. at ----, 109 S.Ct. at 956. If the governing instrument does not grant discretionary authority to the plan's administrators, however, courts must review benefits denials de novo. Id.
 
 
 37
 Here we think it clear that the more deferential abuse of discretion standard applies in this case, hence should guide the district court's reconsideration of Crocker's claim on remand. As the administrator of the plan, Southern Bell's Vice President for Personnel has the authority to determine whether force imbalances exist, and indeed whether the company will offer VAMAP benefits at all. J.A. at 190, 192. The administrator also has final authority to approve or disapprove "all separations and all payments under the Plan," subject only to "his [or] her discretion." Id. at 190. Under the express terms of the governing instrument, therefore, the VAMAP plan's administrator obviously has "discretionary authority to determine eligibility for benefits." Bruch, --- U.S. at ----, 109 S.Ct. at 956. And to that extent, the benefits denial challenged here cannot be disturbed absent a showing of abuse of discretion in the sense that the ultimate determination on the merits was not a reasonable one under the plan and the administrators' authority to administer it, see Bruch, 109 S.Ct. at 954.
 
 
 38
 We do not think it appropriate to attempt to determine in the first instance whether the denial of Crocker's claim indeed constituted an abuse of discretion under the Bruch prescription. Of course, there is abundant evidence here of administrative bungling. Indeed, in the course of deciding whether to offer VAMAP benefits to Crocker and others similarly situated, Southern Bell's officers not only failed to comply with the express terms of various procedural provisions of the MTAP plan, but sometimes behaved as though the plan documents simply did not exist. It was obviously a departure from the plan, for example, for the personnel department to seek MTAP-4 acceptances before the company had identified which managers were eligible for VAMAP bonus offers, or for that matter which specific management universes were experiencing force imbalances. The plan contemplates that employees will execute irrevocable MTAP-4 commitments to retire only after the Vice President for Personnel has approved implementation of the VAMAP program in specific departments to remedy previously identified surpluses. As the district court pointed out, moreover, Southern Bell's attempts to comply with ERISA's procedural requirements left much to be desired. The company never provided Crocker with a summary plan description, as required by 29 U.S.C. Secs. 1022(a)(1) & 1024(b). Perhaps more significantly, the company also failed to give Crocker written notice of the "specific reasons for [the] denial" of his VAMAP claim, id. Sec. 1133(1), or to provide him with an opportunity for internal administrative review, as required under the terms of the MTAP plan itself. See J.A. at 201-03.[3]
 
 
 39
 Evidence of procedural malfeasance in the general administration of a plan, however-or for that matter even in the handling of an individual claim--does not necessarily justify a conclusion that a particular benefits denial was so unreasonable on the merits as to constitute an abuse of discretion. As a general rule, procedural violations of ERISA itself or the terms of an individual plan do not entitle an aggrieved employee to a substantive remedy. Wolfe v. J.C. Penney Co., 710 F.2d 388, 393 (7th Cir.1983). Thus, while " 'wholesale and flagrant' flouting of ERISA procedures ... would indeed evidence bad faith," Holland, 772 F.2d at 1149-50, hence might justify a finding of abuse of discretion, the courts have normally found substantive ERISA violations based on maladministration only where fiduciaries repeatedly have refused to comply with employees' affirmative requests for administrative review of claims denials or basic information about plan provisions. See, e.g., Blau v. Del Monte Corp., 748 F.2d 1348, 1353-54 (9th Cir.1985).
 
 
 40
 The point, and it could be critical here, is that, before a court disturbs a challenged benefits determination on the ground that it constituted an abuse of discretion, something more than run-of-the-mill or even flagrant mismanagement standing alone must appear. As the Bruch Court made clear, for example, evidence of administrative bias or an unavoidable conflict of interest should always "be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.' " Bruch, --- U.S. at ----, 109 S.Ct. at 956 (quoting Restatement (Second) of Trusts Sec. 187 comment d (1959)) (emphasis added). If evidence of procedural malfeasance inferentially indicates the presence of a conflict of interest, therefore, such evidence may in turn suggest that the ultimate benefits determination was not a reasonable one, hence constituted an abuse of discretion. Bungling of the sort that occurred here may also be perfectly innocuous, however, hence irrelevant to the question of whether an abuse of discretion occurred in the ultimate claim denial. See Wolfe, 710 F.2d at 393. Where it appears that the plan's fiduciaries quite properly could have denied a beneficiary's claim notwithstanding the technically deficient procedure actually followed, for example, administrative misfeasance does not alone suffice to render the ultimate benefits determination an abuse of discretion.
 
 
 41
 The problem here is that we cannot, on the record now before us, determine whether the obvious technical defects in the defendants' administration of the VAMAP Plan evidence bias or other abuse of the sort that would, even in the face of a deferential standard of review, justify judicial reversal of the administrators' denial of Crocker's claim. Nor can we confidently determine whether the district court implicitly found an abuse of discretion in this rather than an administrative bungling sense. The district court's focus in finding arbitrariness and caprice obviously was on procedures rather than on the ultimate merits of the determination. The district court made no explicit finding, for example, on the obviously important question of whether--putting aside any administrative misfeasance--Crocker actually qualified for VAMAP benefits under the express terms of the plan documents. Nor did the court directly address whether, in this particular setting, Southern Bell's failure to administer the plan according to its express terms justifies an inference of bias or conflict of interest, hence an abuse of discretion in the challenged benefits decision itself. These questions are critical to the proper conduct of judicial review under Bruch, and we therefore have no choice but to remand for reconsideration of the issues.
 
 
 42
 We note finally a closely-related problem in the district court's approach to the case. As indicated, the court impliedly relied on an estoppel theory in support of its finding that Southern Bell arbitrarily denied Crocker's application for VAMAP benefits. It expressly found that Southern Bell officials had promised Crocker he would receive a VAMAP payment, only later to deny the final application after the plaintiff's "psychological and emotional bridges had all been burned." J.A. at 263.
 
 
 43
 Aggrieved plan beneficiaries cannot, however, invoke equitable estoppel as free-standing grounds for judicial invalidation of fiduciaries' otherwise sustainable decisions to deny claims. As other courts repeatedly have held, oral representations and promises of an employers' employees cannot estop an administrator or fiduciary from later denying a claimant's eligibility for benefits under the plain language of the governing plan documents. See Moore v. Metropolitan Life Insurance Co., 856 F.2d 488, 492 (2d Cir.1988) (enforcement of oral promises to employees not otherwise eligible for benefits "would undermine ERISA's framework," since "Congress intended that plan documents ... exclusively govern an employer's obligations under ERISA plans"); Nachwalter v. Christie, 805 F.2d 956, 959-60 (11th Cir.1986) (rejecting argument that courts may "employ the doctrine of estoppel to enforce the alleged oral modification of ... ERISA-governed employee benefit plans"); Thurber v. Western Conference of Teamsters Pension Plan, 542 F.2d 1106, 1109 (9th Cir.1976) ("The fact that [a claimant] relied on representations of an employee of the [defendant] firm retained to administer the trust fund would not estop the ... trustees from denying [the claimant's] eligibility for [benefits]."). We note this merely by way of cautioning that, standing alone, evidence of promissory misrepresentations does not justify interference with otherwise permissible claims decisions--especially in settings where the deferential abuse of discretion standard applies.
 
 
 44
 With these considerations in mind, and on the basis of the Bruch Court's explanation of the appropriate standards and methodology for judicial review of ERISA benefits determinations by plan administrators, the district court should on remand reconsider the premises of its original decision and conduct whatever further proceedings are warranted by Bruch and this opinion.
 
 III
 
 45
 For the foregoing reasons, the judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 46
 VACATED AND REMANDED.
 
 
 
 [1]
 As expressed in ERISA parlance, Southern Bell established the VAMAP program to provide
 an incentive payment to expedite normal attrition within designated management universes. [The program] is designed to be used during a specified time interval to help alleviate a force imbalance which neither the management of attrition nor the reassignment of employees is expected to alleviate within six months or less.
 J.A. at 222 (MTAP Summary Plan Description (SPD) at 2).
 
 
 [2]
 "MTAP" references are to section numbers of the official plan document, which appears at pages 184-203 of the Joint Appendix
 
 
 [3]
 Under 29 U.S.C. Sec. 1133(2), "every employee benefit plan shall ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."